ESTATE OF EVERETT GRYDER, DECEASED, KATHERINE GRYDER, COMMUNITY SURVIVOR, AND KATHERINE GRYDER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Gryder v. Commissioner
Docket No. 3185-91
United States Tax Court
T.C. Memo 1993-141; 1993 Tax Ct. Memo LEXIS 137; 65 T.C.M. (CCH) 2298; April 5, 1993, Filed *137 Decision will be entered for petitioners. For petitioners: Anthony F. Mercurio. For respondent: Brently W. Free. BUCKLEY
BUCKLEY
MEMORANDUM OPINION BUCKLEY, Special Trial Judge: This case was heard pursuant to the provisions of section 7443A(b)(3) and Rules 180, 181, and 182. [1] Respondent determined a deficiency in petitioners' 1987 Federal income tax in the amount of $ 5,143, together with additions to tax under section 6653(a)(1)(A) in the amount of $ 257, under section 6653(a)(1)(B) in the amount of 50 percent of the interest due on the underpayment, and under section 6661(a) in the amount of $ 1,286. At the time the petition herein was filed, petitioners Everett Gryder and Katherine Gryder, resided at Houston, Texas. Everett Gryder died on October 7, 1991. Katherine Gryder is the community property survivor of Everett Gryder. There was no administration *138 of Mr. Gryder's estate nor were letters of administration issued. Respondent determined that Everett Gryder had received unreported income from S & S Services, Inc. and Arballo Transportation, Inc. in the amounts of $ 12,152 and $ 4,918, respectively. Some of the facts have been stipulated, and they, together with stipulated exhibits, are so found and incorporated herein by reference. Everett Gryder (hereafter Mr. Gryder) worked as a truck broker, someone who would obtain loads for drivers. He also worked as a "shagger" in Galveston. Shagging involves picking up truck trailers parked near the dock, hauling them to the boats to be loaded, and then returning them to a drop-off point. Then, the trailer owners would pick up the loaded trailers and deliver the cargo to its destination. In Galveston, Mr. Gryder was shagging bananas. In connection with his shagging business, Mr. Gryder would often pay the drivers in cash and then the companies would reimburse him for the amounts he had paid. These reimbursements would be deposited in petitioners' bank account. It is unclear from the record but apparently Mr. Gryder ran the shagging business through his corporation, Gryder Enterprises, *139 Inc. During 1987, Mr. Gryder also worked as an employee for four or five different companies prior to the time he suffered a heart attack. Among the companies Mr. Gryder worked for were S & S and Arballo. He received Form W-2s from both companies, and it is agreed that he reported all of the Form W-2 income from those companies shown on the joint 1987 Federal income tax return. Petitioners received a Form W-2 from Arballo in the amount of $ 4,750 for 1987 and from S & S in the amount of $ 500 for that year. Both companies also filed Forms 1099 indicating Mr. Gryder had received nonemployee compensation of $ 12,152 from S & S and $ 4,918 from Arballo. Petitioner contends that she and Mr. Gryder did not receive either of the Forms 1099, and that they did not receive the amounts set forth on those forms as income. Mr. Gryder incorporated Gryder Enterprises, Inc. (hereafter the Corporation) in 1982 under the laws of Texas. Petitioner and Mr. Gryder each held a 50 percent ownership interest in the Corporation from its incorporation until its final year ending December 31, 1985. The capitalization of the Corporation consisted of $ 1,000 paid-in capital and $ 24,432.71 lent to it *140 by petitioner and Mr. Gryder. In December of 1985, Mr. Gryder, as president of the Corporation, and S & S Services entered into an agreement whereby the Corporation's shagging business was sold to S & S for $ 5,000 down and 40 percent of the gross receipts beginning December 1, 1985, and ending December 1, 1987, payable twice monthly to Mr. Gryder or his estate. The only physical asset included within the sale was a 1968 White tractor. In the sales agreement, the gross receipts from shagging were estimated to be $ 20,000 per year. The 1985 return of Gryder Enterprises was labeled "Final Return". The balance sheet to the return indicated paid-in capital of $ 1,000 and loans from stockholders of $ 24,432.71. This final balance sheet is consistent with that on the opening 1982 return, as well as those filed for 1983 and 1984. The final return indicated negative retained earnings of $ 1,560.66. We hold that petitioners lent the sum of $ 24,432.71 to the Corporation at the time of its incorporation. During 1987 petitioners reported the receipt of income in the amount of $ 34,678.77, consisting of wage income, interest, dividends, State tax refunds, and unemployment insurance. *141 [2] During the same year petitioners had total deposits of $ 40,703.37 into their bank account at Commonwealth Savings of Houston. At least $ 18,583 of the deposits made were in cash. The Commonwealth bank account was the only bank account of petitioner and Mr. Gryder. Mr. Gryder received a Form W-2 from Arballo Transportation, Inc. in the amount of $ 4,750 for 1987, and all of that amount was reported as wage income on the return. He also received a Form W-2 from S & S Services, Inc. in the amount of $ 500 for the same year, and all of that amount was included as wage income. Petitioner, who also worked, was not involved in the day-to-day activities *142 of the shagging business. She did, however, have some specific information about other sources of cash or check deposits into the account. Petitioner was a credible witness, and we believed her testimony. Petitioners, who were in some financial distress because of Mr. Gryder's health problems, sold the condominium in which they had been living in Galveston to a Mr. Lou Snipps, who in return agreed to pay for the purchase by taking over petitioners' mortgage payments and by paying them about $ 127 per month for 5 years. Petitioners received these monthly payments and reported them as interest income on their 1987 return. The mortgage remained in petitioners' names, and Mr. Snipps sent the mortgage payments of $ 1,058.82 monthly to petitioners who deposited the checks in their account and then paid the mortgage company directly from their account. Also during 1987, petitioners received insurance proceeds of $ 2,861.84 as a result of a burglary in their home. This amount was deposited in their account. Petitioner's daughter had previously moved to California leaving her furniture in storage in Houston. Petitioners took care of paying the storage fees, and the daughter would *143 then reimburse them, at about $ 70 per month for a total of approximately $ 840 for the year. Petitioners also deposited into their account a check payable to their nephew, Lee Efferson, from Diamond Tomato Company in a total amount of $ 1,800, as an accommodation to him since he did not have a bank account. Thus, petitioners received amounts not representing income to them totaling approximately $ 18,000, the bulk of which was deposited into their bank account. Petitioners bear the burden, as a general rule, of proving that respondent's determination of deficiency is incorrect. Rule 142(a); . It is apparent that petitioner did not have much direct information about Mr. Gryder's business operations. She is, accordingly, placed in the position of proving a negative -- that Mr. Gryder did not receive the amounts set forth on the Forms 1099 filed by S & S Services, Inc. and Arballo. It is clear from the record, however, that petitioners did make bank deposits which they noted on the deposit slips as from S & S in the amount of $ 7,776.18, and from Arballo in the amount of $ 693.28. Petitioners argue that the *144 S & S payments were either on account of Mr. Gryder's sale of the shagging business to S & S, or that the payments from S & S and Arballo represent reimbursements to him for amounts he paid drivers on behalf of those two companies. Respondent contends that receipts of the sale of the shagging business belonged to and should have been sent to Gryder Enterprises, Inc. rather than petitioners. However, respondent ignores the fact that the agreement of sale regarding the shagging business provides that payments were to be made directly to Mr. Gryder, rather than to Gryder Enterprises. In response to respondent's contention, petitioners also point out that Gryder Enterprises owed them over $ 24,000, and that any amounts received by them belonging to Gryder Enterprises were in partial compensation for the loan. Respondent placed into the record no evidence whatsoever regarding the nature of the alleged nonemployee compensation, other than the fact that respondent's underreporter transcript indicated that the Forms 1099 from S & S and Arballo had been received by respondent. We hold that petitioners have successfully shown this Court that the fact that their bank deposits were in excess *145 of their reported income arose from the deposit therein of nonincome items. Thus the bank deposits do not serve to support respondent's position that petitioners had unreported income. In the final analysis, respondent is in fact relying mainly on the two Forms 1099 received from S & S and Arballo. Petitioners have successfully shown to this Court that the reason their bank account was in excess of reported income was from the deposit of nonincome items, not unreported income. The Court of Appeals for the Fifth Circuit, in , has held that sole reliance upon a Form 1099, without more, is sufficient to hold a notice of deficiency arbitrary and erroneous. We note that appeal of this case lies with the Fifth Circuit. At the least, we hold that petitioners have overcome respondent's presumption of correctness, and respondent has failed to come forward to present evidence about the nature and circumstances of the alleged payments by S & S and Arballo. Thus, respondent may not rely in this case upon the general presumption of correctness. We found petitioner's testimony to be forthright and credible, *146 and it is uncontroverted that petitioners made substantial deposits of cash into their only bank account. Respondent makes great point of the fact of cash deposits, but rather than indicate an attempt to not report cash receipts it indicates to the Court that petitioners were not making any attempt at concealment. We hold that petitioners have satisfied the Court that they did not fail to report income from S & S and Arballo. To give effect to the foregoing, Decision will be entered for for petitioners. Footnotes
1. Section references are to the Internal Revenue Code in effect for the year at issue. Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The parties stipulated that petitioners reported "income" of $ 28,425.56 on their 1987 Federal income tax return. However, the tax return indicates that amount consisted only of wages reported, and other income was also shown on the return. We can only assume that the parties meant to refer only to wage income; otherwise the stipulation is incorrect on its face.↩